Our last case this morning is AstraZeneca. Mr. Basile? Basil. Basil, thank you. May it please the court, I'm Richard, excuse me. I'm Richard Basile and I'm representing Appellant Apotex in this case. Excuse me again, I'm fighting a cold here or something. Apotex is appealing the district court's improper granting of a preliminary injunction because the court made three errors with respect to AstraZeneca's ability to show likelihood of success and one error, additional error, regarding AstraZeneca's ability to show that it would be irreparably harmed. The first error that the district court made was when it reviewed the prior art patent, the Radhakrishnan patent, which had all the elements of the patented invention except for the term element, budesonide composition. When the court construed the term budesonide composition, it ignored the plain teaching of the patent and instead relied on the extrinsic evidence. Yeah, we're on the liposomes issue, but in doing so, she construes it in a way that covers the only product that is on the market and the only one that would work. If you had liposomes, you wouldn't have the depot effect and the magnificent advance that this made in the art. So why isn't her interpretation of the composition element correct? Well, first of all, you don't construe claims just so that they cover commercial embodiments. What you look to is the... Well, but it's the preferred embodiment that you wish to cover and we say it should always cover the preferred embodiment. This is the only embodiment. Well, and it should also cover all the embodiments that are disclosed in the patent and the other embodiments that's disclosed in Claim 3 is a budesonide composition that uses liposome to encapsulate the budesonide. The specification mentions liposomes at one point, including, and liposomes comes in a laundry list, but why isn't the district judge doing the right thing under our law in construing it to cover the preferred embodiment? Because they're limiting the actual claim, the actual... If you had liposomes, it wouldn't work, right? The depot effect wouldn't work. But the Claim 1 doesn't claim just... If that was their invention, that it was to exclude liposomes and you relied on the testimony she did, the district court did, based on the expert that the real novelty in this invention was somehow being able to come up with a formulation that wasn't encapsulated budesonide, then that's what they should have claimed in the patent. What they used was a claim term, budesonide composition, which is the plain and ordinary meaning of the word. It's a term used in the art. It's a broad term. Well, but the budesonide composition that you would use would be one that would work, right, and would produce this depot effect that reduces the number of applications you have to make and the risks inherent in that. Wouldn't that be a natural way for the judge to interpret that, interpret it so that the invention works and so it covers the preferred embodiment and then you could throw in that she's also interpreting it to preserve the validity of the patent. But the patent itself, those in the field who are reading that patent, who are trying to stay out of the market, have to read the patent, have to be educated as to what the invention is. And in reading that special... Are you suggesting, since you have to copy it precisely in order to get into the marketplace, that you don't know what's in it? You know whether it has liposomes or not. This patent has to do about once-a-day administration. That's what the novelty was, not whether the formulation was a liposome. And the only way you get there is if you have a budesonide composition that doesn't have liposomes, right? But the patent doesn't say that. The patent teaches that you can use liposomes. I've read it. The patent teaches that you can use liposomes. We're talking, are we not, about just one sentence, correct? The sentence in column three that says solutions or suspensions can be encapsulated in liposomes or biodegradable microspheres? Yes. Is there anything else in the specification or is that the only sentence that deals with liposomes? Well, just prior to that, in that paragraph coming in, it also mentions liposomes as being an excipient. Well, that's an excipient, but that's something different, is it not? Depending on how it's used. But in this case, the patent discloses liposomes as an embodiment. Well, you say it discloses it as an embodiment. It's that one sentence, correct? Yes, Your Honor. So there's nowhere else, there are no examples, correct, dealing with liposomes? There's nothing in the specification that explains how or why a formulation with liposomes might provide this ability to deliver just one dose a day or anything relating to that, correct? Correct, Your Honor. So we're left with just, we're left to read, what is the significance of this one sentence that simply sits there in a sea of information that seems to be related to the use of budeserone in solution or otherwise? Well, I'd respond that I don't think it's up to the patentee in hindsight to decide which sentences in the specification are important and which aren't. The claim itself is one sentence, and that seems to teach a lot. And just to dismiss it as just one sentence and that there's more information, patents have many embodiments, and sometimes there are discussions and examples of embodiments. We're looking at what one of skill in the art would think budesonide composition means. Wouldn't one of skill in this art, that's a pretty elevated skill level too, isn't it? The pharmaceutical expert is a pretty talented person. They're going to know that the only budesonide composition that works to get the depot effect to get you down to the minimal dosage level is one without liposomes, aren't they? Well, I don't think that's necessary. Aren't they going to know that? There's no evidence that that is the only liposome that will work. That was the only evidence that was presented to the court at the preliminary injunction hearing. Wouldn't one of skill in the art know what the budesonide composition is in this patent that works? This patent only goes to twice a day. There's no evidence that budesonide compositions were known in the prior art. There were many types of budesonide compositions. There's no evidence that one that uses liposomes wouldn't work for once a day. And this is the problem with the court's ruling, is it relied on extrinsic evidence of an expert to completely contradict what was explicitly stated in the specification. The specification is what teaches and informs those of skill in the art. And there's no doubt in my mind that if Apotex had made a formulation using a liposome, AstraZeneca would have sued them, and we probably would have lost on summary judgment that the claim construction includes liposomes because the specification describes it as an embodiment. But your invalidity argument would have been a lot stronger in that case. Yes. Right? I take them as I get them. What do you make of the sentence at column three, lines, well, I won't read the whole sentence, but just the second half of the sentence, lines 12 through 14. The invention is not limited by any particular mechanism of action. Is that a reference to the depot effect? Let me throw out a working hypothesis as to the way I read it, and you tell me if this is not the way you read it. I read that to say that the patentee did not regard himself or themselves as limited to the depot effect, but simply is saying the depot effect is our understanding of how this works, but we're not limiting ourselves to the depot effect as the mechanism that makes this invention work.  Right. Because they are trying to get the broadest scope that they can, and when they chose the words to use in the claim, this is a sophisticated company that has a huge patent portfolio. When they pick and choose their words, they're careful what they do, and they just claim to be designated composition. I don't think in any way by those claims were they trying to limit the particular solution and how it was formulated to one particular embodiment of the patent. There's nothing in the patent that disavows the use of liposomes. There was nothing during the prosecution that limited this invention to those embodiments, and this Court has repeatedly instructed those reading patents, if one is going to read a patent, and you were going to read a claim to exclude an embodiment, there needs to be an express disavow somewhere. Now, I take it that, and this may not be right, let me ask you, would you read the term budesonide composition to reference the solutions or suspensions that contain budesonide, as opposed to, in other words, where I'm going with this is, are we talking about, for example, a liposome that has within it a budesonide composition? That can exist, I guess, in some liposomes, right? I'm not an expert in the field, I'm not sure it can. My understanding is that what they're talking about is the suspensions, the liposome surrounds budesonide. Surrounds, but is it pure budesonide, or is it a budesonide solution that's inside the liposome? I don't want to try to testify. My understanding, and the way I've understood it, is that it's just budesonide. There may be some other elements in there, or components. But the point is that this, let's not forget also with respect to this patent, budesonide, twice a day, was known in the prior art. That product was known in the prior art, in that it was used, in that it was this once a day limitation that gave these claims their value.  about the broad reading of the patent. It doesn't mean that isn't the right reading, but there's clearly the inventors thought that they had come up with something that for the first time allowed an effective once a day treatment. That's what they say. And if what they're saying is one of the ways you can do this is simply to use the tried and true method of putting these things in liposomes, where's the invention there? Maybe that's your argument, that they don't have an invention here, but it seems inconsistent with the thrust of the first part of the specification to say, oh, and by the way, one of the embodiments is the embodiment that's been around for a long time. Well, I think the patentee is always trying to get the broadest coverage he can. In the specification he described multiple embodiments. If that was not the invention, why are they putting liposomes in there specifically saying that solution or suspensions can't be encapsulated in liposomes or biodegradable mitosis? Well, see, that's why I wondered about whether we're talking about liposomes that encapsulate a suspension of budesonide. Yeah, I don't think that was... As opposed to one that, as you described it, contains budesonide not in suspension or solution. Yeah, I believe the testimony of the experts and everything was that it was a liposome around budesonide, not around a budesonide solution. But that sentence wouldn't include that, would it? Solutions or suspensions encapsulated in liposomes would not describe what you just described, right? Those of skill in the art reading that sentence understand that sentence means budesonide surrounded by a liposome. Budesonide that's not in suspension or solution? Budesonide that's in a suspension... Yeah, but not in... Well, all right. I understand. Do you want to preserve some rebuttal time, Mr. Basile? Yes, I would. Okay, fine. And we'll hear then from Ms. Loring. Thank you. May it please the Court. Just an error in patent drafting? How do you get liposomes in here if they're not the invention at all? Your Honor, first of all, our expert, Dr. Williams, testified in detail before the District Court about the liposome formulation and how the budesonide interacts with the liposomes. And in fact, what happens is the budesonide is inserted inside the membrane of the liposome. And that's at A3899-3902 of the appendix. And what he described was if you place this budesonide inside the membrane, first of all, you no longer have budesonide dispersed in a solvent, which is the way budesonide composition is defined in the patent. Budesonide dispersed in a solvent in the form of a solution or a suspension. The plain language in the specification makes it clear that the budesonide must be in contact with the solvent. In a liposome, that is not the case. The budesonide is in the lipophilic, fat-loving membrane. Do you think that that sentence can be read to describe a different sort of structure for the liposome? That is to say, a liposome in which the budesonide solution or suspension is inside the liposome. Your Honor, I refer you to our expert's testimony. He has explained to us, and this is of course not in the record, that that is not a possible formulation with a liposome with the budesonide in the middle. Because the budesonide is lipophilic, it's fat-loving, it will automatically control the lipid membrane. Now, I'd like to address Your Honor's question about the sentence that you pointed to in column 3, lines 12 to 13 or 14, where it says this proposed mechanism of action is exemplary and the invention is not limited to any particular mechanism. I believe that is a reference to the fact that they're not sure at this point in time that this is the precise mechanism, but they certainly understand the depot effect. And if you notice, if you look at that paragraph, it talks about budesonide. It does not talk about budesonide compositions. And so this is an additional sentence that is directed to, for example, an alternative embodiment, the liposomes. With liposomes, do you have the depot effect? Our expert testified that you would not have the depot effect because... So the only working invention is one that doesn't use a liposome. Yes, and Your Honor... And why then is that sentence at 37, to go back to Judge Rader's initial question, at 37 through 38, what's your hypothesis for why that sentence is sitting there? My hypothesis is that when they were drafting the application, they said someday we may come up with a liposome. And so a liposome formulation, they put it in there... And they wanted to make sure that the patent covered it? They wanted to disclose to the world that this is a potential future formulation. However, when they defined their invention in the patent and they talked about what worked, what made the budesonide available for the depot, what their clinical studies had been done with, it was budesonide dispersed in a solvent. But the claims don't say budesonide solution or budesonide... Suspension. Suspension, thank you. I'm sorry, sir. The claims do not say budesonide solution or budesonide suspension. The claim says budesonide composition. Well, there are claims directed to budesonide suspensions and there are claims directed to budesonide compositions, which are... But not claim one uses budesonide composition and doesn't specify whether it's a solution or a suspension or, for that matter, a liposome. But, Your Honor, that is true. Claim one refers to budesonide composition. However, the entire specification talks about budesonide dispersed in a solvent. In the liposome formulation, budesonide is not dispersed in a solvent. When you look at the patent specification... Claim three, I'm sorry, column three, line 22, the drug can be delivered dispersed in a solvent, e.g. in the form of solution or suspension. So the solution and the suspension are the two forms of budesonide composition that are described throughout the specification. Well, it's described in that paragraph and it is described throughout the specification. But again, the question is, what about that stray sentence? Your Honor, I would refer you to the tip decision where, in fact, the Court also construed claims consistent with their plain meaning and the specification, notwithstanding the fact that there was  And the Court said, patents lots of times have alternative embodiments disclosed that are not claimed. And if you give me one second, I will give you the cite for that case. Well, we're familiar with that. It is 529 F. 3rd, 1364. It's also cited in our brief. Could I turn your attention to the Thorax? Absolutely. There was very little attention paid to that ad by the District Court. But I have to be candid with you that I thought it deserved a little more attention than it got. It troubled me. Why don't you tell me why that Thorax ad does not anticipate, particularly in light of Dr. Chip's, I think it's fair to say, admission on cross-examination that the characterization of the titration down in the ad is essentially the same as the characterization in the label. Sure, certainly. I think there are two reasons why the Thorax ad is not in anticipation of the claims. The first one is the context of that sentence that Dr. Chip's testified about within that ad. And the print is very small. I apologize. It's at A6512. But I'd like to just read a little bit of that text to put that sentence in context because what Dr. Chip said was the sentence, the maintenance dose should be the lowest dose which keeps the patient symptom-free means the same thing as titrate patients to the lowest effective dose. Which is the label language. He said that. He never said that the Thorax ad was the same as the Apotex label. And there's a very important reason why it is not. What the ad says is it's got a little section called dosage and administration. And it talks about an initial dose. And it says initially during periods of severe asthma and then it sets forth recommended starting doses. And they are all twice a day. Then it has the sentence about the maintenance dose which should be the lowest dose which keeps the patient symptom-free. Then it says recommended doses are and it goes on to list recommended maintenance doses both of which are twice a day. Adults .5 to 1 mg twice daily. Children .25 to .5 mg twice daily. That is the critical difference between this ad and the Apotex label. So he's saying lowest dose will be the amount you give in two times a day. That's correct. And in the... Reduce the amount but you still do it twice a day. Yes. Is it also true that there's a timing element here? Yes. Once daily dosing in 1997 is not perceived as possible, right? That is correct, Your Honor. And that is because in 1994 when the Apotex label published, there had been this invention of the AstraZeneca patents had not been made and nobody appreciated that nebulized budesonide compositions would be effective once daily. When AstraZeneca made its invention, when it conducted its clinical studies, published those studies and introduced its drug with its label showing clinical studies that show that once a day is safe and effective, then the world realized that you can, in fact, titrate pulmicort respials or Apotex's generic product down to once a day dosing. And that is so there are the two differences. The Thorax ad is specifically limited to twice a day dosing. It sets forth twice a day maintenance doses. Apotex's label does not have lowest effective doses because the lowest effective dose varies from patient to patient and, in fact, is .25 mg once daily for a number of patients. And so when you read that titrate down statement in Apotex's label, you come away with a different understanding from the one you have if you read the Thorax ad. I'd like to take a minute, although counsel didn't raise specific intent. I wanted to talk a minute about the Grokster standard for specific intent because I think that in its brief Apotex misstates that standard. The Grokster court, in a passage that Apotex quotes, talks about where there is no use other than an infringing use, then intent is inferred. But if you look at the context of that quote, and that's at page 932, it says, in sum, where an article is good for nothing else but infringement, there is no legitimate public interest in its unlicensed availability and there is no injustice in presuming or imputing an intent to infringe. What the court is talking about there is actually contributory infringement. The whole paragraph preceding that quote is a discussion of contributory infringement and, in fact, the case cited in that quote, the 1906 Canada case, is a contributory infringement case. And that's an element of contributory infringement, of course. And then the court goes on and says, however, where the product has substantial non-infringing uses, a more acute fault is required. And, of course, what the Supreme Court is referring to there is inducement and you do require more for inducement. You require instructions and you require a specific intent. But the Grobster case nowhere said that you cannot infer specific intent where there are non-infringing uses. I guess I'd like to take a minute to talk about the cross-appeal. And we are primarily going to rest on our papers, but I do want to make one point and then answer any questions Your Honors may have. We believe and submit that the district court erred in not taking into account the special relationship between an FDA-approved drug and its label. Can you claim a label? Can you claim a label? Well, Your Honor, we submit you can claim a label as part of a kit, a label along with the drug. So you're incorporating a method into an apparatus kit claim then. Is that appropriate? It is appropriate because the kit includes the drug and its safety and efficacy information. You cannot have a drug without its safety and efficacy information. Well, that's FDA law. We're talking patent law here. Well, yes, Your Honor. And, in fact, a skilled person reading this claim can understand. As a matter of patent law, can you incorporate a method into an apparatus claim? I think you can, Your Honor. I think you certainly can with product-by-process claims, and it's a similar arrangement. For example, in the Gulag case, you had numbers on a band that enabled you to do a math exercise. Yes, but that's a measuring cup case. The number is part of the cup. I think there's a big difference between this and that. That's essentially, I think, what Nagai says. To the extent that— How do you get around Nagai? You say that there's a special rule for pharmaceuticals. Not a special rule, Your Honor, but rather a special relationship. A special relationship that is governed by— That strikes me as a distinction without difference, but go ahead. A special relationship that's governed by the FDA requirements and the law and the fact that you cannot have a drug without a label. All right. Ms. Loring, you consumed your rebuttal time, but let's give two extra minutes to Mr. Baisel.  We'll see how much time you have coming. She's computing. I'm sorry. I'm all done. That's all right. His rebuttal? 2.30. Thank you. And now if you'd add two minutes to that. Thank you. You've got about five minutes. Could you make sure and save some of it for Thorax? Okay, you go ahead. I'll do my best. You may proceed. You have five minutes. First of all, I want to address this issue about the Grokster case and that there was a cite to the Grokster case that related to contributory infringement. If you want to look at a case that says the same thing with respect to inducing infringement, that's Warner-Lambert v. Apotex, 316F3rd at 1365. And there it clearly says that the intent to induce should not be inferred even when the defendant has knowledge where a product has substantial non-infringing uses. And that goes to this inducement issue and to the Thorax article as well. But isn't the difference here the fact that the label has this titration down language? So it's not just that there may be substantial non-infringing uses, but there's some instruction that would lead to an infringing use. But this is the problem. The instruction in Apotex's product relates to the instruction for twice-a-day administration, the same instruction that's in the Thorax article in the prior article. All Apotex is trying to practice is what was in the prior article, twice-a-day administration. That language in there does not, that they're pointing to this titration down, it doesn't explicitly teach once a day. It does not say you must use this once a day. That's been all removed. This is a case where the Section 8 carve-out occurred, the generic, took out all explicit references to it. But if the smallest file is .25 twice-a-day and the instruction says titrate down? Well, AstraZeneca's own expert said that that language is the same as in the Thorax, so if it means you have to go... The context is a little different. But there's additional, at best, there's an additional meaning to that term now. But I really am interested in your response to Judge Menn's specific question, if you could. In the context of the .25 twice-a-day, what is titrating down? We've only got one way out. It would go down once a day. Yeah, so why doesn't the statement titrate down when one of the doses is .25 twice-a-day? Why doesn't that say, in effect, once a day? Even if it says once a day to those patients who are using .25, it doesn't say once a day to the people who are using it twice a day, that are using higher dosage forms. Okay, but suppose it did say once a day for 25% of the population that would be taking the drug, and the rest would not be infringing. But when it gives that direction, a specific direction, with respect to some considerable portion of the using population, that doesn't get you out from induced infringement, does it? Well, I would take issue with the inducement, it certainly does, because what that label, that testimony that that language teaches that is AstraZeneca's expert. The FDA, when the FDA read that label, they said it didn't teach it. Wait a minute, let's stay with my hypothetical here. Suppose the label had said, explicitly, for those for whom titration down from .25 twice-a-day is necessary under the regime in which we try to titrate down to the lowest effective dose, they will titrate down to once a day at .25. Would you disagree that that would constitute inducement? I would if there were substantial non-infringing uses. So you can induce, knowingly and intentionally induce, 25% of your potential purchasers to infringe, and you get out because 75% of your intended purchasers will not infringe? I don't think it's you getting out. You're trying to allow unpatented product to get into the market and to look at... I think there's a huge difference between my hypothetical and the case in which I sell a drug, and I may be aware that out there somewhere there's somebody that uses that drug in a way that I haven't instructed, I haven't authorized, but some doctor is using it in a way that would infringe. There's a big difference between that versus a case in which you say, here's how to use it in an infringing manner, even though you know that most of the people that buy the drug will not use it in that manner. Am I wrong in thinking there's a big distinction? I would agree with you if the language in that instruction was, use it once a day. Well, that was my hypothetical. And you said under my hypothetical that that wouldn't be infringement. It wouldn't be induced infringement. I'm sorry that I misunderstood your hypothetical. To me, that would be explicit instructions to practice the patented invention. Even if only a small percentage of the users had occasion to practice in that fashion, or even were expected to practice in that fashion, right? Yes, if you had a huge population that was using it twice a day and only a small one, but you put that in the label to use it once a day, and the claim was use it once a day, I would agree with you. Thank you, Mr. Asil. Did you have a comment? I did have one more question. I really wanted to get Mr. Bates. Since I hogged all this time, I want to give him a chance to talk about the Thorax ad. Your response to Ms. Loring's argument on the Thorax? Well, I think this goes back to that which infringes earlier. I mean, infringes later, would invalidate if earlier. That language was in the prior act. It was people were using it twice a day. In that language, the titration down language is now being used as a hammer against Apotex that they're intentionally trying to get people to use it once a day. That same language in the prior art didn't get people to use it once a day. But the same language is put around sentences that say, of course you're going to be doing it twice a day, because at this point the art doesn't allow anything else. No one even considers the chance of once a day. And that's the same as the Apotex label, because all once a day has been removed. It's only twice a day that's in there. And there's a finding by the FDA that says that language does not— But that gets us back into Judge Bryson's call of duty with you. I understand the argument. Final thought, Mr. Basile, for us? Well, again, I don't think there's enough evidence to show specific intent on the part of Apotex, because the part of that label that they referred to again, that supposedly instructs once a day, the only evidence of that was AstraZeneca's expert. It's contrary to what the FDA ruled when it read. And there's no evidence that Apotex actually believed what Dr. Williams testified to, that that would teach. And to have specific intent, they should have to prove that Apotex put that language in, knowing and with the intention to get people to use it once a day. That language has really only been there for twice a day use. Thank you, Mr. Basile. Ms. Loring, I didn't hear anything about the cross-appeal, so I don't think there's anything for you to address at this point, right? That's correct, Your Honor. Thank you very much.